Kristofer D. Leavitt, ESQ
LEAVITT LEGAL GROUP, P.C.
Nevada Bar No 13173
612 S. 10th Street
Las Vegas, Nevada 89101
(702) 423-7208
kleavitt@leavittlegalgroup.com

*Attorney for Plaintiff Jan Sheinfeld*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| JAN SHEINFELD, an individual<br><br>Plaintiff,<br><br>vs.<br><br>BMW FINANCIAL SERVICES NA, LLC, a foreign limited liability corporation; BMW OF NORTH AMERICA, LLC, a foreign limited liability corporation; JRJ INVESTMENTS, INC.d/b/a BMW OF LAS VEGAS, a Nevada limited liability corporation; DOES 1 through 20, inclusive; and ROE CORPORATIONS 1 through 20, inclusive;<br><br>Defendants. | Case No.: 2:18-cv-02083-JAD-GWF<br><br>**OPPOSITION TO MOTION TO STAY LITIGATION AND COMPEL ARBITRATION [ECF No. 4]**<br><br><br>**ORAL ARGUMENT REQUESTED** |

COMES NOW Plaintiff JAN SHEINFELD ("Mr. Sheinfeld"), by and through his counsel of record, Kristofer D. Leavitt, Esq. of LEAVITT LEGAL GROUP, P.C., and hereby responds to Defendants BMW Financial Services NA, LLC ("BMW FS") and BMW of North America, LLC's ("BMW NA") (collectively as "BMW") *Motion to Stay Action and Compel Arbitration* [ECF No. 4] (the "Motion") and Defendant JRJ Investments, Inc. d/b/a BMW of Las Vegas' ("JRJ") *Defendant JRJ Investments, Inc. d/b/a BMW of Las Vegas's Joiner to Defendants' Motion to Stay Action and Compel Arbitration* [ECF No. 5] (the "Joinder").[1]

---

[1]    The Joinder does not raise any issues or offer any arguments different than the issues and arguments in the Motion.  As such, Mr. Sheinfeld will focus his response on the Motion.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The instant Opposition is made and based upon the attached Memorandum of Points and Authorities, the Declaration of Mr. Jan Sheinfeld (the Sheinfeld Declaration) attached hereto as **Exhibit 1**, the papers and pleadings on file in this action, and any oral argument the Court may allow at any hearing on the Motion and Joinder.

DATED this 16th day of November, 2018.

LEAVITT LEGAL GROUP, P.C.

By: _____*Kristofer D. Leavitt*_____
Kristofer D. Leavitt, Esq. (13173)
612 S. 10th Street
Las Vegas, Nevada 89101

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**</u>
<u>**OPPOSITION TO MOTION TO STAY ACTION AND COMPEL ARBITRATION**</u>

## I.     INTRODUCTION

BMW rightly concedes that Plaintiff's claims are "a warranty action" concerning the vehicle at issue, a 2017 BMW 5-Series (the "Vehicle").  Motion, (ECF No. 4, 3:5-6).  In other words, BMW acknowledges Mr. Sheinfeld's complaint seeks to rescind a lease agreement he entered into with BMW and return the Vehicle to BMW due to the Vehicle's failure to comply with the terms of the express and implied warranties provided by BMW and JRJ.  *See*, Complaint (ECF No. 1, Ex. A).  Because Mr. Sheinfeld's claims revolve around BMW and JRJ's failure to provide a vehicle that comports with its written and implied warranties, they fall squarely within the Moss-Magnusson Warranty Act (the "Act").

As Mr. Sheinfeld's claims fall under the Act, they are not subject to binding arbitration clauses as a matter of law.  Rather, claims under the Act can only be subject to informal dispute settlement procedures set up by manufacturers, *see* 15 U.S.C. § 2310(a), before proceeding to litigation, *see id.* at § 2310(d).  Importantly, the decisions rendered in this informal dispute settlement procedure "***shall not be legally binding on any person.***"  16 C.F.R. § 703.5(j) (emphasis added).  Thus, even if Mr. Sheinfeld did "express[ly] and broad[ly] consent to arbitrate any and all disputes with the Defendants" as BMW claims, *see* Motion (ECF No. 4, 3:11-12), the arbitration agreement is simply unenforceable as to the claims brought by Mr. Sheinfeld.

## II.     LEGAL ANALYSIS AND ARGUMENTS

### A.     Mr. Sheinfeld's Claims Fall Within the Scope of the Act Because he is a Consumer Who Purchased a Consumer Product That is Not Conforming to its Written and Implied Warranties

Mr. Sheinfeld's claims in the Complaint fall within the scope of the Act because he is a consumer who has been damaged by his warrantors' and supplier's failure to provide a consumer

product that comports with the applicable written and implied warranties.  The Act provides sweeping, comprehensive relief for any "consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under [the Act], or under a written warranty, implied warranty, or service contract."  15 U.S.C. § 2310(d)(1).

A "consumer" under the Act is broadly defined as:

> a buyer (other than for purposes of resale) of any consumer product any person to whom such product is transferred during the duration of an implied or written warranty (or service contract) applicable to the product, and any other person who is entitled by the terms of such warranty (or service contract) or under applicable State law to enforce against the warrantor (or service contractor) the obligations of the warranty (or service contract).

*Id.* at § 2301(3).  This definition can be broken down into four categories:  (1) any person who purchases a consumer product for a purpose other than the resale of the purchased product; (2) any person who is transferred a consumer product during the applicable warranty period of the transferred product; (3) any person who is entitled by the terms of a warranty to enforce the obligations of the warranty; and (4) any person who is entitled to enforce the obligations of the warranty under applicable state law.  *See*, *id.*; *see also*, *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 986 (N.D. Cal. 2014).  As will be discussed in greater detail below, Mr. Sheinfeld qualifies as a consumer under the second, third, and fourth categories identified above.[2]

1. *Mr. Sheinfeld Qualifies as a Consumer Under the Second Category Because He is a Consumer Who Was Transferred the Vehicle, Which is a Consumer Product, During the Applicable Warranty Period*

Mr. Sheinfeld's claims in this action fall within the scope of the Act because he qualifies as a consumer under the second category identified above.  To qualify for protection under this second category, a plaintiff must meet three requirements: (1) the plaintiff must be a consumer;

---

[2]   Mr. Sheinfeld concedes he is not a category one consumer as he did not purchase the Vehicle.

(2) the plaintiff-consumer must acquire a consumer product; and (3) the consumer product acquired must be covered by an applicable written or implied warranty. Because the question of whether Mr. Sheinfeld is a consumer relies heavily on whether the Vehicle was a consumer product and whether the Vehicle was covered by a valid warranty, Mr. Sheinfeld will address the last two elements prior to addressing the first.

> i.    Mr. Sheinfeld is a Consumer Because the Vehicle is a Consumer Product

Mr. Sheinfeld qualifies as a consumer because the Vehicle is, without question, a consumer product.  The Act defines a "consumer product" in expansive terms as "any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes." 15 U.S.C. § 2301(1).  Importantly, the determinative test for whether an item is a consumer product has nothing whatsoever to do with its intended use in a specific instance, but, rather, whether the product is usually and normally used for personal, family, or household purposes. *See Cat Aircraft Leasing, Inc. v. Cessna Aircraft Co.*, 1990 U.S. Dist. LEXIS 14720 (D Kan Oct. 3, 1990) (holding that a Cessna Citation SII jet was not a consumer product because, despite its personal use, it was not a product normally utilized for personal use); *see also Ruelas v. Freightliner, LLC*, 2008 U.S. Dist. LEXIS 15135 (ED Cal Feb. 27, 2008) (holding that a tractor trailer was not a consumer product because, despite its personal use, it was normally and typically used for commercial purposes).

In other words, "a product is a 'consumer product' if the use of that type of product [for personal, family, or household use] is not uncommon." 16 C.F.R. § 700.1(a).  Moreover, "[t]he percentage of sales or the use to which a product is put by any individual buyer is not determinative" and "products such as ***automobiles*** and typewriters ***which are used for both personal and commercial purposes come within the definition of consumer product***." *Id.* (emphasis added).  Finally, "[w]here it is unclear whether a particular product is covered under

the definition of consumer product, any ambiguity will be resolved in favor of coverage." *Id.*

Thus, it is clear from the Act, and supporting regulations, an automobile, such as the Vehicle, is a consumer product because it is normally and usually utilized for personal, family, and household needs. While Plaintiff would concede BMW probably has corporate programs for fleet vehicles and markets its vehicles to businesses, the vast majority of BMWs, especially a sedan like the 5-series, are almost certainly used for personal, family, or household use. Moreover, it is highly likely even the vast majority of the vehicles sold or leased by BMW as part of a fleet program are provided to executives, officers, and other employees of the businesses for their personal use. If, after looking at the normal use of the Vehicle, the Court cannot convincingly conclude the Vehicle is not a consumer product, the statutory presumption in favor of including the Vehicle as a consumer good should certainly carry the day. *See id.*

Much like the Cessna Citation SII in *Cat Aircraft* and the tractor trailer in *Ruelas*, the use to which the item is put in a specific set of circumstances is of little or no consequence and the analysis, instead, focuses on what the product is usually and typically used for. This means the apparent mistake of checking the box for "Business, Commercial, and Agricultural Purposes" in the Lease is meaningless, *see* (ECF No. 4-2, ¶ 4), and certainly is not cause to "seriously question" the validity of Mr. Sheinfeld's claim as BMW does in the Motion, *see* Motion, (ECF No. 4, 6:1 n.2). Even if the Court were to examine how Mr. Sheinfeld used the Vehicle, which it should not, Mr. Sheinfeld would still qualify as a consumer because he used the Vehicle almost exclusively for personal, household, and family uses.

        ii.    <u>Mr. Sheinfeld is a Consumer Because he Acquired the Vehicle During the Applicable Written and Implied Warranty Periods</u>

Mr. Sheinfeld is a consumer because the Vehicle was also acquired during the applicable written and implied warranty periods. As noted on the Lease, Mr. Sheinfeld took possession of the Vehicle on April 4, 2017 when the Vehicle had 103 miles on the odometer. (ECF No. 4-2).

According to the terms of BMW's *New Vehicle Limited Warranty* (the "Written Warranty"), BMW provides several warranties including a "New Vehicle Warranty" that lasts for "48 months or 50,000 miles, whichever occurs first." **Exhibit 2**. pg. 2.[3]  BMW's "New Vehicle Warranty" protects "against defects in materials or workmanship to the first retail purchaser, and each subsequent purchaser." *Id.*  Additionally, BMW also states any implied warranties, such as the warranty of merchantability or warranty of fitness for a particular purpose, remain in effect for at least as long as its express warranties. *Id.* at pg. 3.  As the Vehicle is less than two years old and has yet to reach 50,000 miles, *see* Sheinfeld Decl. ¶ 2, the Vehicle is unquestionably still within the warranty period, thus bringing Mr. Sheinfeld's claims within the scope of the Act.

> iii.    Mr. Sheinfeld is a Consumer Because the Vehicle is Protected Under Written and Implied Warranties

Mr. Sheinfeld is a consumer because when he leased the Vehicle, and at all times thereafter, it was covered by written and implied warranties.  The Act defines a written warranty as "any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer … which written affirmation, promise, or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product."  15 U.S.C. § 2301(6).  The Act defines an implied warranty as "an implied warranty arising under State law … in connection with the sale by a supplier of a consumer product." *Id.* at § 2301(7).  Fur purposes of the Act, a supplier is "any person engaged in the business of making a consumer product directly or indirectly available to consumers." *Id.* at § 2301(4).

While the written and implied warranty both require a sale, lessees are included under the Act when a lessor purchases an automobile from a third-party, usually a manufacturer, and leases

---

[3]    BMW's warranty can also be found online at:

the automobile to a consumer.  *See Dekelaita v. Nissan Motor Corp.*, 343 Ill. App. 3d 801, 799 N.E.2d 367, 373-74, 278 Ill. Dec. 649 (Ill. Ct. App. 2003) (stating that, "[w]here, as here, there was a sale — between the dealer and the lessor — it suffices to say that there was a written warranty issued in connection with the sale"); *Mago v. Mercedes-Benz, U.S.A., Inc.*, 213 Ariz. 404, 142 P.3d 712, 717-18 (Ariz. Ct. App. 2006) ("decid[ing] that a qualifying sale must occur something within the sequence of events that ultimately places the consumer product with the consumer[;] [plaintiff] produced evidence that the sale from Dealer to Lessor led to his lease [and,] [c]onsequently, [plaintiff] is not precluded from seeking relief under the [MMWA] merely because he was not the buyer in the qualifying sale").

Leases are included under the Act because "a lessor purchases the vehicle not for resale, but to lease it to the lessee."  *MyFord Touch*, 46 F. Supp. 3d at 987 (citing *Mago*, 142 P.3d at 718 ("decid[ing] that a vehicle lessor can qualify as a buyer 'for purposes other than resale' because 'the plain language of § 2301(6) does not require that a buyer purchase the consumer product without a future intent to resell the product [-] [r]ather, § 2301(6) requires only that the buyer have purposes for purchasing the product other than resale'")).  In other words, "in a typical car lease, the warranty claimed by Plaintiffs … can be said to have been 'issued in connection with' the 'sale' between dealer and the lessor (e.g., the finance company)."  *In re MyFord Touch*, 46 F. Supp. 3d at 987.

Here, Mr. Sheinfeld believes, and believes he can prove, BMW sold the Vehicle to JRJ so JRJ would be able to lease the Vehicle to an end customer.  Mr. Sheinfeld also believes, and believes he can prove, as part of that transaction, BMW ensured JRJ the Vehicle would be covered by BMW's usual warranties, and any implied warranties, when the Vehicle was subsequently leased to an end customer.  *See* Complaint (ECF No. 1, Ex. A, ¶ 16) (affirming the

https://www.bmwusa.com/content/dam/bmwusa/warranty-

Vehicle will be covered by BMW's standard new vehicle warranty).  Following the sale, JRJ leased the Vehicle to Mr. Sheinfeld and BMW's warranties became of basis of the bargain between JRJ and Mr. Sheinfeld.  Because BMW's warranty was an integral part of Mr. Sheinfeld's decision, he should be able to seek protection under the warranty BMW made in connection with the sale to JRJ.

       2.    *Mr. Sheinfeld is a Consumer Because he is Entitled to Enforce the Obligations of the Warranty Under Applicable Nevada Law*

Mr. Sheinfeld qualifies as a consumer under the fourth category identified above, because he is entitled to protection under Nevada law.  Under Nev. Rev. Stat. 104 "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."  Nev. Rev. Stat. 104.2314(1).  Stated differently, "unless excluded, or modified, a warranty of merchantability is implied in a contract if the seller is a merchant with respect to the goods in question." *Scaffidi v. United Nissan*, 425 F. Supp. 2d 1172, 1185-86 (D. Nev. 2005) (quoting *Mohasco Indus., Inc. v. Anderson Halverson Corp.*, 90 Nev. 114, 520 P.2d 234, 235-36 (Nev. 1974)) (internal quotation marks omitted).

For goods to be merchantable, they must meet the following standards:

(a) Pass without objection in the trade under the contract description; and
(b) In the case of fungible goods, are of fair average quality within the description; and
(c) Are fit for the ordinary purposes for which such goods are used; and
(d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
(e) Are adequately contained, packaged and labeled as the agreement may require; and
(f) Conform to the promises or affirmations of fact made on the container or label if any.

Nev. Rev. Stat. 104.2314(2).

Importantly, the implied warranty of merchantability from a sales contract between a

---

books/2017/2407709%20BMW%2017MY%203_5_7%20Series%20-%20Warranty.pdf

supplier to the lessor, extends to protect a third-party lessee.  *See* Nev. Rev. Stat. 104A.2209 ("The benefit of the supplier's promises to the lessor under the supply contract and of all warranties, whether express or implied, including those of any third party provided in connection with or as part of the supply contract, extends to the lessee"); *see also Vacation Vill. v. Hitachi Am.*, 111 Nev. 1218, 1220, 901 P.2d 706, 706 (1995) ("by statute, the implied warranty of merchantability does apply to a lease in Nevada").

Here, Mr. Sheinfeld believes, and believes he can prove, there was a sale of the Vehicle from BMW to JRJ.  As part of this sale, Mr. Sheinfeld believes, and believes he can prove, BMW affirmed the various written and implied warranties BMW was required to comply with would also protect JRJ.  Mr. Sheinfeld, who is leasing the Vehicle from JRJ, should be allowed to take refuge under the warranties made to JRJ, who is still the owner of the Vehicle and protected by the warranties made by BMW.  *See MyFord Touch*, 46 F. Supp. 3d at 988 ("a written or implied warranty under the [Act] simply requires a connection with a sale, and a sale can be one between the supplier and a lessor").  Even if Mr. Sheinfeld is incorrect on the specific facts of this case, Nev. Rev. Stat 104A.2209 unambiguously states the warranty of merchantability present in the transaction between BMW and JRJ extends to protect Mr. Sheinfeld, the third-party lessee.  Because Mr. Sheinfeld is entitled to protection under Nevada law, he qualifies as a consumer under the Act.

> 3. *Mr. Sheinfeld is a Consumer Because he is Entitled to Enforce the Obligations of the Warranty by the Plain Terms of the Warranty*

Finally, Mr. Sheinfeld is qualified as a consumer under the Act because he is entitled to enforce the obligations of BMW's various warranties.  In the Lease, BMW and JRJ affirm that "[i]f the Vehicle is new, the Vehicle is subject to the standard manufacturer's new vehicle warranty."  *See* Complaint (ECF No. 1, Ex. A, ¶ 16).  Because the Vehicle only had 103 miles on it at the time of the lease, *see id.*, it certainly qualifies as a new vehicle.  BMW's New Vehicle

Warranty protects the Vehicle for four (4) years and 50,000 miles, and the Vehicle has not surpassed either of those milestones.  *See id.*; *see also* Sheinfeld Decl. ¶ 2.  As a result, the Vehicle is entitled to the protections of BMW's expansive "New Vehicle Warranty."  *See* Ex. 2, pgs. 2-3.  Because Mr. Sheinfeld is covered by BMW's New Vehicle Warranty, he is a consumer under the Act and his claims fall within the scope of the Act.

> **B.      The Court Should Defer to the Federal Trade Commission's Interpretation of the Act and Agree That Claims Under the Act Are Not Subject to Binding Arbitration Clauses**

The Acts creates an exceptionally simple two-step-dispute-resolution system.  The first step is for informal dispute resolution, *see* 15 U.S.C. § 2310(a), followed by litigation in the event informal dispute resolution is unsuccessful, *see id.* at § 2310(d).  In 1975, when the Act was passed, the entity responsible for administering the Act, the Federal Trade Commission ("FTC"), determined decisions in the informal dispute resolution process "shall not be legally binding on any person," 16 C.F.R. § 703.5(j), and prohibited warrantors from including binding arbitration agreements for claims under the Act.  *See* 40 Fed. Reg. 60167, 60210 (Dec. 31, 1975) (explaining the rationale for why binding arbitration is prohibited under the Act).  Approximately 25 years later, the FTC reaffirmed its previous interpretation and confirmed the Act "will continue to prohibit warrantors from including binding arbitration clauses in their contracts with consumers that would require consumers to submit warranty disputes to binding arbitration."  64 Fed. Reg. 19708-09 (April 22, 1999).

The FTC's interpretation of the Act, which precludes binding arbitration of claims brought under the Act addresses a question not specifically addressed by Congress and the interpretation is perfectly reasonable.  Because the FTC's interpretation meets both of these requirements, the interpretation is entitled to deference from the Court under *Chevron*.  If the Court defers to the FTC's interpretation, the Motion must be denied.

1           1.     *The FTC Has Determined the Act's Two-Part-Dispute-Resolution System*

2                     *Precludes Mandatory, Binding Arbitration of Claims Brought Under the Act*

When Congress passed the Act, it declared that one of its purposes was to "improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products" by allowing manufacturers to "warrant[] a consumer product to a consumer by means of a written warranty."  15 U.S.C. § 2302(a).  Although manufacturers are not required to provide warranties, when they do provide warranties the Act "imposes specific duties and liabilities" on those who do.  16 C.F.R. § 700.3(a).

When passing the Act, Congress also expressly "declare[d] it to be [Congress'] policy to encourage warrantors to establish procedures whereby consumer disputes are fairly and expeditiously settled through informal dispute settlement mechanisms."  15 U.S.C. § 2310(a)(1).  To that end, Congress tasked the FTC with establishing "rules setting forth minimum requirements for any informal dispute settlement procedure which is incorporated into the terms of a written warranty to which any provision of [the Act] applies."  *Id.* at § 2310(a)(2).  Pursuant to this congressional delegation of rulemaking authority, the FTC has established detailed regulations governing the "mechanisms" that warrantors can require customers to utilize prior to "exercising rights or seeking remedies created by [the Act]."  16 C.F.R. § 703.2(b)(3).  This mechanism is described in 15 U.S.C. § 2310(a), and is clearly contemplated as a precursor, rather than an alternative to, litigation.  *See* 16 C.F.R. § 703.5(g) (stating that a decision reached in the informal dispute resolution process is admissible in subsequent litigation).

When the FTC set forth the rules governing the informal dispute mechanism contemplated under the Act, it explicitly stated that decisions reached under the informal resolution mechanism "shall not be legally binding on any person."  16 C.F.R. § 703.5(j).  In fact, the FTC received various public comments dealing with the specific issue of whether

warrantors could include binding arbitration agreements in their warranties and the FTC rejected those suggestions when it explained:

> The [Act] does not allow [binding arbitration agreements] for two reasons. First, as the Staff Report indicates, Congressional intent was that decisions of [the informal dispute resolution mechanism are] not be legally binding. Second, even if binding Mechanisms were contemplated by … the Act, the Commission is not prepared, at this point in time, to develop guidelines for a system in which consumers would commit themselves, at the time of product purchase, to resolve any difficulties in a binding, but non-judicial, proceeding. The Commission is not now convinced that any guidelines which it set out could ensure sufficient protection for consumers.

40 Fed. Reg. 60167, 60210 (Dec. 31, 1975).

Approximately 25 years after the Act was passed and the FTC set forth its initial regulations, the FTC reaffirmed its position that claims under the Act were not subject to binding arbitration agreements.  The FTC unambiguous affirmed "[16 C.F.R. § 703.5(j)] will continue to prohibit warrantors from including binding arbitration clauses in their contracts with consumers that would require consumers to submit warranty disputes to binding arbitration." 64 Fed. Reg. 19708-09 (April 22, 1999).  The FTC went on to state that "reference within the written warranty to any binding, non-judicial remedy is prohibited" by the Act and the FTC's regulations.  *Id.* Because of this position, the FTC "determined not to amend [16 C.F.R.] § 703.5(j) to allow for binding arbitration." *Id.*

>   2.   *The FTC's Interpretation of the Act, Precluding Binding Arbitration, is Entitled to Judicial Deference Under* Chevron

The U.S. Supreme Court has held:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question

1
2

> for the court is whether the agency's answer is based on a permissible construction
> of the statute.

3
4

*Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)

(footnotes omitted).

5
6
7
8
9
10

Thus, the Court is required to defer to the FTC's interpretation of the Act unless (1) Congress has spoken on the precise issue and (2) the FTC's interpretation in unreasonable.  Since Congress has not spoken on this specific issue and the FTC's interpretation is not unreasonable, the Court should defer to the FTC's interpretation of the Act and deny BMW's request to compel Mr. Sheinfeld to participate in binding arbitration under the Federal Arbitration Act ("FAA").

11

i.   <u>Congress Has Not Addressed the Specific Question of Whether the Act Prohibits Binding Arbitration</u>

12
13
14
15
16
17
18
19
20

When analyzing whether Congress has addressed a specific issue, courts often resort to examining the text, legislative history, and purpose of a statute in an effort to ascertain Congressional intent.  *See Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 227, 107 S. Ct. 2332, 96 L. Ed. 2d 185 (1987).  The text and legislative history of the Act are inconclusive when it comes to Congressional intent under the Act, however, the purpose of the Act, and its informal dispute resolution mechanism, indicate Congress did intent to prohibit binding arbitration.

21
22

a.   <u>The Text and Legislative History of the Act Does Not Demonstrate Congressional Intent to Prohibit Binding Arbitration of Claims Under the Act</u>

23
24
25
26
27
28

There is nothing in the text of the Act that prohibits binding arbitration of claims under the FAA.  In fact, the only provision in the text of the Act discussing consumer remedies is § 2310, which is aptly titled "Remedies in Consumer Disputes."  15 U.S.C. § 2310.  This section is silent on whether Congress intended the Act to prohibit binding arbitration of claims pursuable under the Act.  *See id.*  Similarly, Plaintiff can find nothing in the legislative history that

confirms or denies whether Congress addressed this specific issue.  As a result, the first two prongs of the *McMahon* test are inconclusive.

> b.   The Purpose of the Act Does Demonstrate Congressional Intent to Prohibit Binding Arbitration of Claims Under the Act

The purpose of the Act, however, does evidence an intent from Congress to prohibit binding arbitration of Act claims.  The first indication Congress intended the Act to preclude binding arbitration is that the Act was enacted ***after*** the FAA.  If the FAA offered a sufficient mechanism for warrantors and consumers to resolve disputes under the Act, there would be no need to Congress to "encourage warrantors to establish procedures whereby consumer disputes are fairly and expeditiously settled through informal dispute settlement mechanisms."  *Id.* at § 2310(a)(1).  Stated differently, if the FAA's mandate to enforce arbitration agreements provided a sufficient, or even a desirable, avenue for dispute resolution of claims under the Act, there was no need for Congress to create a new resolution mechanism, task the FTC with creating the minimum requirements for the resolution mechanism, and charge the FTC with continually reviewing warrantor's compliance with the established minimum requirements of the resolution mechanism.

The second indication Congress intended the Act to preclude binding arbitration is that arbitration has become an increasingly formal process that often requires in-depth discovery, extensive motion practice, and the assistance of legal counsel.  *See, e.g.*, Edward Brunet, *Replacing Folklore Arbitration with a Contract Model of Arbitration*, 74 Tul. L. Rev. 39, 42-47 (1990) (describing the shift from the "folklore arbitrations" that were common in the early part of the twentieth century, wherein "informal procedures dominated," there was "little or no discovery" and "evidence rules were inapplicable" to modern arbitrations which "resemble litigation" in the sense that there can be "routine discovery, motion practice, application of

substantive legal rules, [and] written discursive awards with findings of fact and conclusions of law"); G. Richard Shell, *ERISA and Other Federal Employment Statutes: When is Commercial Arbitration an "Adequate Substitute" for the Courts?*, 68 Tex. L. Rev. 509, 534 (1990) ("Historically, commercial and labor arbitration have shared a basically informal approach to the actual fact-finding and adjudication process. . . . In response to recent Supreme Court decisions encouraging the use of commercial arbitration, however, and as part of a general effort to ensure that arbitration procedures adequately protect substantive rights, commercial arbitration institutions have begun to reform their procedures and have added considerable formality to their proceedings.")  Because of the increasingly formal nature of arbitration it is no longer, if it ever was, an "informal" process where a consumer and warrantor can easily resolve a dispute.  The change of arbitration into a formal dispute resolution process demonstrates binding arbitration is not in line with the spirit, or the letter, of the Act.

The third, and final, indication that Congress intended the Act to preclude binding arbitration is that if warrantors can simply include a binding arbitration agreement as a standard term in their contract—an extraordinarily common practice—it would completely eliminate the informal dispute resolution mechanism contemplated under the Act.  As is obvious from the face of the Lease, BMW includes the arbitration clause it is attempting to enforce against Mr. Sheinfeld as a standard term of its leases.  *See* Complaint (ECF No. 1, Ex. A).[4]  This means virtually every one of BMW's customers who finance the purchase of a BMW are subject to the terms of a binding arbitration agreement. What's more, this standard term is essentially offered to consumers on a take-it-or-leave-it basis.  If a consumer does not agree to BMW's terms, they

---

[4]      It is highly likely BMW includes the same exact term in its finance contracts, purchase contracts, and other contracts it enters into with consumers.

can take their business elsewhere.[5]  This means, in practice and in actual fact, BMW has created its own mechanism that completely bypasses the Act's informal dispute resolution mechanism. This result, which is the result championed by BMW and JRJ, renders the Act's informal dispute resolution mechanism immaterial, irrelevant, and inconsequential.  This is not an outcome the Court should condone.

### ii.  The FTC's Interpretation of the Act is Reasonable

At the outset, it is critically important to note that Congress has "delegated authority to the agency generally to make rules carrying the force of law."  *United States v. Mead Corp.*, 533 U.S. 218, 121 S. Ct. 2164, 2171, 150 L. Ed. 2d 292 (2001).  Because of this, courts are required to defer to an agency's interpretation of a statute unless it is unreasonable.  *Chevron*, 467 U.S. at 843.  Here, the FTC's interpretation of the Act is undoubtedly reasonable and it must be followed by the Court.

On its face, a reading of the Act that Congress intended to create a two-step-dispute-resolution process is imminently reasonable.  One factor weighing in favor of the FTC's interpretation is the familiar maxim of statutory construction, *expressio unius exclusio alterius est*, meaning expression of one is the exclusion of the other.  *See Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458, 38 L. Ed. 2d 646, 94 S. Ct. 690 (1974) (discussing the "ancient maxim" of "expressio unius est exclusion alterius").  This maxim is a "product of logic and common sense" standing for the proposition that "when a statute limits a thing to be done in a particular mode, it includes a negative of any other mode."  *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 899 (9th Cir. 2005) (quoting *Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1313 (9th Cir. 1992)) (internal punctuation and citations omitted).

---

[5]   Even if a consumer did take their business elsewhere, it is unlikely to matter because other automobile manufacturers almost certainly have the same, or a substantially similar, provision in their own agreements.

This ancient maxim based on logic and common sense affirms that Congress' inclusion of a separate and distinct informal dispute resolution mechanism indicates Congress intended to exclude other dispute resolution mechanisms, such as binding arbitration, from the remedies available to consumers and warrantors under the Act.  By including non-binding arbitration and litigation, Congress implicitly stated binding arbitration was not to be used.

The FTC's interpretation is also reasonable from a practical stand point.   Creating a mechanism that, first, allows a warrantor and a consumer to meet for an informal attempt to resolve their dispute and, second, allows the consumer to pursue any unresolved claims in court with the assistance of counsel is the epitome of reasonableness.   It requires consumers to approach warrantors so situations where a product is obviously defective can be quickly and efficiently resolved.   It also allows warrantors the ability to meet with consumers and possibly dissuade them from pursuing weak claims.   Both of these options a still allows cases that are close calls to proceed to litigation.   This is reasonable almost by definition.

The reasonableness of this process is made more apparent when the Court considers the outcome of the alternative.  As discussed above, by including binding arbitration agreements as a standard term of its contracts, BMW has created a dispute resolution mechanism that completely bypasses the informal dispute resolution mechanism of the Act.  If § 2310 is read is such a way so as to permit binding arbitration, it would read itself into extinction.   This is simply not reasonable.

The FTC's interpretation of the Act is also reasonable because it is based on legislative materials from when the Act was passed.  The FTC's interpretation of the Act is based on a staff report of the House Interstate and Foreign Commerce Committee's Subcommittee on Commerce and Finance.   See 40 Fed. Reg. 60167, 60210 (Dec. 31, 1975).[6]   This means the FTC's

---

[6]         As far as Plaintiff can tell, this staff report is no longer available to the public.

interpretation finds it roots in the legislative materials and reports that preceded, and informed, passage of the Act.  An interpretation based on Congressional proceedings and materials creates a strong presumption the FTC's interpretation is reasonable.

Another factor supporting the reasonableness of the FTC's interpretation of the Act is that the interpretation was a *contemporaneous* regulatory interpretation of the Act.   An administrative interpretation "has peculiar weight when it involves a contemporaneous construction of a statute by the [persons] charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new."  *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450, 57 L. Ed. 2d 337, 98 S. Ct. 2441 (1978) (alteration in original) (quoting *Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 315, 77 L. Ed. 796, 53 S. Ct. 350, (1933)) (internal quotation marks omitted).  One reason for this unusual deference to an agency interpretation is "the agency that enforces the statute may have had a hand in drafting its provisions" which means the agency "may possess an internal history in the form of documents or 'handed-down oral tradition' that casts light on the meaning of a difficult phrase or provision")  Stephen Breyer, *Judicial Review of Questions of Law and Policy*, 38 Admin. L. Rev. 363, 368 (1986).   Because the FTC rendered its interpretation in and around the time the Act was passed, it is far more likely to reflect Congressional intent than the efforts of unrelated parties attempting to divine meaning from an incomplete legislative record nearly fifty years later.

A final factor demonstrating the reasonableness of the FTC's interpretation of the Act is the fact that the interpretation has stood, unchanged, since the FTC first set it forth.  See *NLRB v. Bell Aerospace Co. Div. Textron Inc.*, 416 U.S. 267, 274-75, 40 L. Ed. 2d 134, 94 S. Ct. 1757 (1974) ("[A] court may accord *great weight* to the longstanding interpretation placed on a statute by an agency charged with its administration" (emphasis added)).  The Supreme Court has also

stated that long-standing interpretations of regulations should be viewed with a "credential of reasonableness." *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 740, 135 L. Ed. 2d 25, 116 S. Ct. 1730 (1996) ("agency interpretations that are of long standing come before us with a certain credential of reasonableness, since it is rare that error would long persist"). The "credential of reasonableness" carried by the FTC's interpretation of the Act is only buttressed by the fact that the FTC has reconsidered, and ***reaffirmed***, its long-standing interpretation. *See* 64 Fed. Reg. 19708-09 (April 22, 1999).

All of these factors work together to demonstrate the FTC's interpretation of the Act is reasonable. Because the FTC's interpretation is reasonable, the Court should defer to it and deny the Motion.

**C.** **The Court Should Not Compel Arbitration Because the More Specific Arbitration Provisions Contained in BMW's Warranty, Which Control Over the More General Provisions in the Lease, Do Not Mandate Arbitration and Mandating Arbitration Would Render the Arbitration Provisions in the Lease Meaningless**

Both BMW and JRJ are attempting to enforce general arbitration agreements, however, these agreements do not control over the specific arbitration agreements contained in BMW's warranties ("BMW Warranty" or "Warranty"). The more specific arbitration agreement contained the Warranty do not require the Court to compel arbitration. Additionally, the Court must read the general arbitration agreements in harmony with the specific arbitration agreement in the Warranty, and the only way to do so is to read the general arbitration agreements as not controlling in this case.

*1.   The Specific Arbitration Agreement in the Warrant Controls Over the General Arbitration Agreement in the Lease*

The specific arbitration provisions contained in the Warranty—which do not require the Court to compel arbitration—should control over the general arbitration provisions in the Lease. "A standard rule of contract interpretation is that when provisions are inconsistent, specific terms

control over general ones." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 891 (9th Cir. 2003); *see also Shelton v. Shelton*, 119 Nev. 492, 497, 78 P.3d 507, 510 (2003) (affirming that a specific contractual provision will control over a general provision).  Here, under the terms of the Lease, any party to the Lease has the ability to compel arbitration related to a "Claim" that party may have against another party.  *See*, Complaint (ECF No. 1, Ex. A, ¶ 41).  "Claim" is "broadly" defined, and

> means any claim, dispute or controversy, whether in contract, tort, **statute**, or otherwise, whether pre-existing, present or future between me and you or your employees, officers, directors, affiliates, successors or assigns, or between me and any third parties if I assert a Claim against such third parties in connection with a Claim I assert against you, which arises out of or relates to my credit application, the least, **purchase or condition of the Vehicle**, this Lease, or any resulting transaction or relationship (including any such relationship with third parties who do not sign this Lease).

*Id.* (emphasis added).

In BMW's Warranty, however, BMW "offers additional assistance through BBB Auto Line" which is a "dispute resolution program" that "resolves disputes through mediation and arbitration."  Ex. 2, pg. 35.  BMW also goes on to offer additional information and specific provisions and programs pertinent to New Jersey, California, and Idaho residents.  *Id.* at pgs. 33-37.  Importantly, BMW does not seek to arbitrate or mediate any warranty claims in Nevada.  *See id.*

Here, the arbitration agreements BMW and JRJ are attempting to enforce, are BMW's general, form arbitration agreements.  The arbitration provisions in BMW's Warranty, however, are more specific to Mr. Sheinfeld's claims.  These specific provisions in the Warranty, rather than the general provisions in the Lease, are the provisions that should be controlling in this case.  These controlling provisions do not require the Court to compel arbitration, so it should not.

/ / /

2.     *The Only Way to Read the General Arbitration Agreement in Harmony With the Specific Arbitration Agreement is to Read Arbitration Agreement as Not Controlling in this Case*

"It is a well[-]established principle of contract law . . . that where two interpretations of a contract provision are possible, a court will prefer the interpretation which gives meaning to both provisions rather than an interpretation which renders one of the provisions meaningless." *Quirrion v. Sherman*, 109 Nev. 62, 846 P.2d 1051, 1053 (Nev. 1993) (citing *Royal Indemnity Co. v. Special Service Supply Co.*, 82 Nev. 148, 413 P.2d 500 (1966)).

If the Court were to accept BMW and JRJ's assertion that of the arbitration agreement in the Lease requires arbitration of Mr. Sheinfeld's warranty-based claims, it would render the arbitration provisions in the Warranty meaningless.  If BMW can simply elect to force a consumer into binding arbitration for its warranty-based claims, rather than allow the consumer to pursue mediation, arbitration, and litigation as outlined in the Act, it would almost certainly elect to do so.  More specifically, if BMW is faced with the choice of allowing a consumer to pursue non-binding mediation, followed by the possibility of litigation, or simply electing to pursue binding arbitration, BMW will almost certainly choose binding arbitration 10 times out of 10.  This choice would save BMW a substantial amount of time, money, and other resources and is simply a matter of logic.

BMW's decision, supported by the expansive reading of the arbitration agreement in the Lease it is pushing for, would render the arbitration provisions in the Warranty meaningless. This cannot be done because the two provisions must be read in harmony wherever possible. Fortunately, the Court can read these provisions in harmony by simply reading arbitration provisions in the Warranty as controlling for warranty-based claims and reading the general arbitration provisions to be controlling for all other claims. This is the only reading that allows both provisions to coexist in harmony.

III.    CONCLUSION

The Court should deny the Motion because Mr. Sheinfeld's claims fall squarely within the Act and claims brought under the Act are not subject to binding arbitration as a matter of law. Even if the Court determines claims under the Act are subject to binding arbitration clauses, the arbitration clause in the Lease is not controlling.  The more specific arbitration provision in the Warranty is the appropriate provision and this provision does not require arbitration of Mr. Sheinfeld's claim.   Whatever the route, the Court should deny the Motion and allow Mr. Sheinfeld to pursue his claims before the Court.

DATED this 16th day of November, 2018.

LEAVITT LEGAL GROUP, P.C.


By:    _Kristofer D. Leavitt_____
Kristofer D. Leavitt, Esq. (13173)
612 S. 10th Street
Las Vegas, Nevada 89101

**CERTIFICATE OF SERVICE**

I, the undersigned employee of LEAVITT LEGAL GROUP, P.C., hereby certify that, pursuant to the Federal Rules of Civil Procedure and the District of Nevada Electronic Filing Procedures and on the 16th day of November, 2018, the foregoing **OPPOSITION TO MOTION TO STAY ARBITRATION AND COMPEL ARBITRATION [ECF No. 4]** was served via electronic service to the parties below:

Patrick J. Reilly, Esq.
Maximilien D. Fetaz, Esq.
BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614

*Attorneys for BMW Financial Services NA, LLC and*
*BMW of North America, LLC*


Martin A. Little, Esq.
Alexander Villamar, Esq.
Howard & Howard Attorneys PLLC
3800 Howard Hughes Parkway, Suite 100
Las Vegas, NV 89169

*Attorneys for JRJ Investments, Inc.*
*d/b/a BMW of Las Vegas*

_____
*Kristofer D. Leavitt*
Employee of LEAVITT LEGAL GROUP, P.C.